```
             UNITED STATES BANKRUPTCY COURT
                DISTRICT OF CONNECTICUT



In Re                        * Chapter 7
                             *
                             * Case No. 21-20971(JJT)
     JOHN WAYNE MACADLO,      *
                             *
             Debtor.          *
                             *
* * * * * * * * * * * * * * * *
```

                       TRANSCRIPT OF

                   341 MEETING OF CREDITORS


                     November 17, 2021


               Electronically Recorded by the
             Office of the United States Trustee


                 Transcript Prepared By:


                 Christine Fiore, CERT
         Fiore Reporting and Transcription Service, Inc.
               4 Research Drive, Suite 402
                 Shelton, CT  06484
                    (203)929-9992

```
APPEARANCES:

For the Debtor:              GARY J. GREENE, ESQ.
                             Green Law, PC
                             11 Talcott Notch Road
                             Farmington, CT 06032

Chapter 7 Trustee:           BONNIE MANGAN, ESQ.
                             Law Office of Bonnie
                              Mangan
                             1050 Sullivan Ave
                             South Windsor, CT 06074

For Charles Kuman,           RICHARD ZEISLER, ESQ.
 Creditor:                   Zeldes Needle and
                              Cooper
                             1000 Lafayette Blvd.
                             Bridgeport, CT 06604

For the U.S. Trustee:        KARI A. MITCHELL, ESQ.
                             JENNIFER MOORE, Paralegal
                             U.S. Trustee's Office
                             Giaimo Federal Building
                             150 Court Street, Room 302
                             New Haven, CT 06510
```

1          TRUSTEE MANGAN:  This is the case of John

2     Wayne Mocadlo.  This is case number 21-20971.  This

3     meeting is being recorded.

4          Sir, when you have a moment, can you

5     please raise your right hand?

6          (The debtor is sworn.)

7          THE WITNESS:  Yes.

8     EXAMINATION BY TRUSTEE MANGAN:

9        Q    For the record, can you please say your

10    first and last name only?

11       A    John Mocadlo.

12       Q    Okay.  And Mr. Mocadlo is here with his

13    attorney.

14          MR. GREENE:  Gary Greene.

15       Q    Okay.  Sir, what's your marital status?

16       A    Divorced.

17       Q    How long ago, please?

18       A    September, 2016.

19       Q    Okay.  Let me just take a look here.

20    Okay.  So you think it was September of 2016?  Oh

21    yeah, there it is --

22       A    Yes, ma'am.

23       Q    -- it was -- a judgment was entered

24    September 14th of 2016.  On account of your divorce,

25    were you promised money or property that didn't come

1    to you as a result of the divorce that was coming to

2    you in the future?

3         A    No.

4         Q    How many people occupy your household?

5         A    One.

6         Q    Have you lived in Connecticut for at least

7    two out of the past three years?

8         A    Yes.

9         Q    Have you ever had to file a bankruptcy

10   case before?

11        A    Yes, I believe 2002.

12        Q    Okay.  And was it here in Connecticut?

13        A    Yes and it was dismissed.

14        Q    Yeah.  It looks like you had a case, a

15   Chapter 13 in February of 2003 and it was dismissed.

16   Is that the one you're referring to?

17        A    Yes, ma'am.

18        Q    And you had a Chapter 7 in Connecticut in

19   August of 2001 that was dismissed?

20        A    Yes.

21        Q    Okay.  So you had two cases previously,

22   right?

23        A    Um-hmm.

24        Q    One was a Chapter 7 and one was a Chapter

25   13.  It looks like both cases were dismissed.

```
 1        A    Yes.

 2        Q    Okay.  When you went to file the case

 3   you're here about today, did you meet with your

 4   attorney or someone in his office to fill out the

 5   paperwork that was filed with the court?

 6        A    Yes.

 7        Q    Did you answer the questions honestly and

 8   accurately?

 9        A    Yes.

10        Q    Did you list everything you own and

11   everyone you owe money to?

12        A    Yes.

13        Q    Do you need to change or amend any of the

14   information you put on your bankruptcy paperwork?

15        A    No.

16        Q    Do you remember signing the paperwork

17   before it was filed with the court?

18        A    Yes.

19        Q    Did you understand you were filing the

20   paperwork under penalty of perjury?

21        A    Yes.

22        Q    And did you live at the address that's on

23   your bankruptcy paperwork when your case was filed?

24        A    Yes.

25        Q    Do you still live there?
```

1      A    Yes.

2      Q    Okay.  I have from Attorney Greene his

3  declaration verifying your identity and along with

4  that he provided me with a State of Connecticut

5  driver's license with your photo, and I also have a

6  document to verify your Social Security number,

7  which is your Social Security card.  Do you remember

8  giving those documents to Attorney Greene?

9      A    Yes.

10     Q    Okay.  And can you please verify for me

11 the last four digits of your Social Security number?

12     A    0917.

13     Q    Okay.  And, let me see here. Are you the

14 subject of any pending criminal charges or have you

15 been ordered to pay criminal restitution and/or

16 fines that are still owed?

17     A    No.

18     Q    All right.  Okay.  I'm going through your

19 paperwork, sir, and I see that -- I've just got to

20 get it called up here -- all right.  Hold on one

21 second, sorry.

22     (Pause.) You do not list an interest in real

23 estate like a building, a house, land, anything like

24 that, is that correct?

25     A    Correct.

1       Q    Within the four years before you filed

2    your case, was your name on a deed or removed from a

3    deed?

4       A    I did own real estate, yes.

5       Q    And tell me when -- what city and town is

6    the real estate located in?

7       A    Wallingford, Connecticut.

8       Q    And what happened to it, please?

9       A    I sold the house.

10       Q    When did you do that?

11       A    September of 2020.

12       TRUSTEE MANGAN:  And Attorney Greene, I'm

13    not sure if I have -- was that on the statement of

14    financial affairs, Attorney Greene?

15       MR. GREENE:  I believe it was.  If it

16    wasn't --

17       All right.  Let me double check.  All

18    righty, I'm just looking here.  I don't see it,

19    maybe it's just me, that I don't see it on here.

20       Q    Sir, what -- tell me a little bit about

21    that transaction?  When did you -- you sold the

22    house in September of 2020.

23       A    Correct.

24       Q    Who did you sell it to?

25       A    Wayne Basterash (ph).

1      Q    Is he related to you?

2      A    No.

3      Q    Okay.  How much did you sell the house

4   for?

5      A    It was the exact amount of my payoff, so -

6   - Mike Reiner did the closing, Attorney Reiner, so

7   there was no money made on it.

8      Q    Okay.  But you didn't receive any proceeds

9   from the sale, is that right?

10     A    No, ma'am.

11     Q    What was the value of the house that you

12  sold?

13     A    I believe 900,000.

14     Q    And how much did you owe on it?

15     A    About 900,000.

16     Q    So are you saying it was about even to

17  what -- the value of the property was even with the

18  payoff.  Who was the mortgage to?

19     A    I believe it was -- I can't remember

20  exactly who it was, but I believe there was even a

21  deficiency and the buyer actually paid the

22  deficiency too.  There was I think maybe 12 or

23  13,000 extra I owed.

24     Q    Now when you did this sale, did you go

25  through a real estate agent?

1          A     No.

2          Q     So this was someone you knew?

3          A     Yeah, it was actually a second mortgage

4    for a home (indiscernible).

5          Q     I'm sorry, I couldn't hear you.  How much

6    was the second mortgage?

7          A     There was a second mortgage for 300,000

8    and I was going to default on it and rather than

9    default, I sold the house to the gentleman for that

10   interest.

11         Q     Who was the second mortgage to?

12         A     He was the second mortgage.

13         Q     Okay.  So the buyer held the second

14   mortgage and you sold the house to the buyer for the

15   payoff of the first mortgage?

16         A     First and the second combined, correct.

17         Q     Wait a minute.  The first and the second

18   combined or just the first?  I'm sorry.

19         A     Well, no.  So the first was about 600,000

20   and the second was about 300,000 --

21         Q     Oh, so he gave 900,000?

22         A     Correct.  So he paid off his note and he

23   paid off the first note.

24         Q     Sounds a little crazy, but okay.  He paid

25   himself $300,000 back?

1       A     Well, yeah.  The property -- the value of

2   the property reclaimed his money that he lent to me

3   originally.

4       Q     Was the house on the market?

5       A     Yes.

6       Q     How much was it on the market for?

7       A     About a million.  It was listed with Amy

8   Rio for six months.

9       Q     And no offers?

10      A     No offers.

11      Q     All right.

12      A     It was right in the middle of COVID too,

13  unfortunately.

14      Q     Oh and that's my point because COVID did

15  crazy things to real estate, so --

16      A     Yeah.

17            TRUSTEE MANGAN: Attorney Greene, I don't

18  have any information about this.  Do you have any of

19  the paperwork?

20            MR. GREENE:  I'm looking now.  What I have

21  actually is the OP-236 which shows that --

22            TRUSTEE MANGAN: That's just the conveyance

23  form.

24            MR. GREENE:  -- it's the conveyance, the

25  state and the town conveyance forms which show that

1    it was for no consideration.  So basically it was --

2    it looks like it was a deed in lieu of foreclosure

3    or a quit claim deed.

4              TRUSTEE MANGAN: Can you please send me --

5              MR. GREENE:  I can get you --

6              TRUSTEE MANGAN:  -- yeah, get me the --

7    because it sounds like it was done in your office.

8              MR. GREENE:  Yeah.

9              TRUSTEE MANGAN: And who did Attorney

10   Reiner represent, the purchaser, the seller?

11             MR. GREENE:  No we represented John.

12             TRUSTEE MANGAN:  So you represented the

13   seller and someone else represented the purchaser?

14             MR. GREENE:  Yes, we do not.

15             TRUSTEE MANGAN: Okay.  Why don't you send

16   me all that information --

17             MR. GREENE:  Attorney Reiner is in my

18   office.

19             TRUSTEE MANGAN: No, I know that.

20             MR. GREENE:  Okay.  Okay.

21             TRUSTEE MANGAN:  No, I know he's with your

22   firm and he said that Attorney Reiner did the

23   closing.

24             MR. GREENE:  Right.

25             TRUSTEE MANGAN: So you should be able to

1      get a hold of the paperwork pretty easily --

2                    MR. GREENE:  Correct.

3                    TRUSTEE MANGAN: -- because it was only a

4      little over a year -- not -- you know, a little over

5      a year ago.

6                    And that wasn't on your statement of

7      financial affairs because it -- well, I guess it's

8      over a year, but I think the other question is two

9      years.  Okay.  But you're going to get that to me,

10     right?

11                   MR. GREENE:  Yes.

12     BY MS. MANGAN:

13         Q    All right.  Now, sir, other than the real

14     estate we just talked about, did you have any other

15     real estate where your name was on a deed in the

16     past four years?

17         A    No.

18         Q    So this was the only real estate interest

19     you had in the four years before you filed?

20         A    Correct.

21         Q    All right.  Where you live now, do you own

22     that property?

23         A    No, it's an apartment.

24         Q    All right.  And so it's in an apartment

25     complex, right?

John Wayne Mocadlo - November 17, 2021                    13

```
 1        A    Yes, ma'am.

 2        Q    Okay.  Does anyone owe you money, sir?

 3        A    No.

 4        Q    Do you have any claims against anybody?

 5        A    No.

 6        Q    All right.  Now, has anything happened to

 7   you where you might bring a claim?

 8        A    No.

 9        Q    Car accident, animal bite, something like

10   that?

11        A    No.

12        Q    Has anyone passed away recently where you

13   might be entitled to receive an inheritance?

14        A    No.

15        Q    You filed your case on the 20th of October

16   of 2021, so in the event that somebody does pass

17   away and you become entitled to receive an

18   inheritance within six months after you file, you

19   need to let me and Attorney Greene know.

20        Do you agree to do that?

21        A    Yes, I agree.

22        Q    Okay.  And do you understand that if

23   somebody does pass away within the six month period

24   after you file and you become entitled to receive an

25   inheritance and for whatever reason you decide
```

1    you're not going to tell me or your attorney, it

2    could be a reason for me to ask the bankruptcy judge

3    to take away your discharge and possibly refer your

4    case to the criminal authorities.  Clear?

5         A    Yes.

6         Q    Let me just see here -- do you have any

7    life insurance that you can cash in for money?

8         A    No, ma'am.

9         Q    All right.  And Attorney Greene sent me --

10   I mean, okay.  So this was the other thing.  The

11   2020 tax returns, are these true and accurate copies

12   of what you filed with the IRS and the state?

13        A    Yes.

14        Q    And it looks like you had a small

15   overpayment from the federal government. About $36?

16        A    Yes.

17        Q    Does that sound right?  And then did you

18   file a Connecticut return?

19        A    Yeah, my accounting firm, I believe, did.

20   And I don't think there was any refund.

21        Q    Yeah, I think it looks like the balance

22   was zero.  Are these documents that I received from

23   your attorney, are these true and accurate copies of

24   what you filed with the IRS and the state?

25        A    Yes, ma'am.

1      Q    Okay.  And on your 2020 tax return when I

2   was looking through it, and there's several schedule

3   on there and in addition to the actual return, and

4   for the year 2020, you filed this only yourself,

5   right?  It wasn't joint with anybody, right?

6      A    Yes.  No, ma'am.

7      Q    And, I'm just trying to see here -- so on

8   this return it looks like there's a schedule for

9   profit or loss from a business for automobile sales

10  -- automobile related sales and services.  Are you

11  still doing that?

12     A    No.  I haven't since January of 2020.

13     Q    Okay.  And so that was a business you were

14  in up until 2020, is that what you're saying, the

15  end of 2020?

16     A    Yes.  The beginning of 2020.

17     Q    All right.  And -- okay.  Now -- and these

18  tax returns I got, they're true and accurate copies

19  of what you filed with the IRS and the state,

20  correct?

21     A    Correct.

22     Q    All right.  Within three months before the

23  filing, were you making any -- paying any debts,

24  making any large payments to creditors, over and

25  above what you would normally pay them by $1,000 or

1    more?

2        A    No.

3        Q    Within three months before you filed the

4    case, were you making balance transfers paying off

5    one credit card with another?

6        A    No.

7        Q    Is anyone holding money or property for

8    you?

9        A    No.

10        Q    Do you have a safe deposit box or self-

11    storage unit?

12        A    No.

13        Q    Did you repay loans to family members or

14    relatives within two years before you filed your

15    case?

16        A    No.

17        Q    Do you own any shares of stock?

18        A    No.

19        Q    Do you own a business of any kind?

20        A    No.

21        Q    Have you owned a business in the four

22    years before you filed your case?

23        A    Yes.

24        Q    Okay.  Can you tell me -- I'm looking at

25    the schedule on your 2020 tax return and it lists

John Wayne Mocadlo - November 17, 2021                    17

1    several businesses here.  I'm going to just read

2    them off to you what you listed here.  BW Motors,

3    LLC.

4         A     Yes.

5         Q     Hartford Auto Group, Inc.

6         A     Yes.

7         Q     Saybrook Buick GMC, Inc.

8         A     Yes

9         Q     Straight Turnpike Automotive, LLC.

10        A     Yes.

11        Q     Are these the only business interests that

12   you had in your name as of the petition date or

13   prior to the petition date?

14        A     Yes, ma'am.

15        Q     Can you tell me -- it looks like they're

16   all related to the automotive sales and service

17   business, is that right?

18        A     Correct.  They were all franchise

19   dealerships.

20        Q     And what happened to them?

21        A     Pretty much the BW Motors was a General

22   Motors dealership that they gave me the franchise

23   and they just essentially lied to me.

24              The property never qualified for an

25   automotive dealership and it costs me my cash

1    reserve of what I had.

2         And in response I entered a management

3    agreement in January of 2020 with a group to buy the

4    dealerships and they had control of the dealerships

5    since then and when COVID hit, they couldn't

6    stabilize it, I guess and everything just spiraled

7    out of control.

8         Q    In what manner, like did it -- did the

9    businesses close, I mean, what happened?

10        A    Yeah.  BW Motors just closed because they

11   couldn't qualify for a dealers licens'e.  Straight

12   Turnpike and Hartford Auto Group and Buick GMC, was

13   signed over to Team Auto that was purchasing the

14   dealerships and a provision they dropped at the

15   Buick GMC store, which was seized by General Motors,

16   and then the other two dealerships they couldn't

17   financially make work so they essentially just let

18   it go and walked away from the deal.

19        Q    And all of this happened because of COVID?

20        A    Yes.

21        Q    And you didn't get any money from any of

22   these ventures or anything?

23        A    No, ma'am.

24        Q    Okay.  Any other business interests as of

25   the petition date?

```
1        A    No, ma'am.

2        Q    No other partnerships, LLC's,

3   corporations, either you're a stockholder of,

4   nothing like that?

5        A    No

6        Q    How about in the four years before the

7   filing?

8        A    Yes.  I was a managing partner of

9   Barberino Nissan in Wallingford, Connecticut.

10       Q    How long were managing that?

11       A    Ten years.

12       Q    And what happened with that?

13       A    I went my separate way and opened my own

14   car dealerships in 2017.

15       Q    Oh, okay.  So you split off from the

16   Barberino's and you went and opened your own place?

17       A    Yes.  I was with them for 19 years all

18   together.

19            TRUSTEE MANGAN: Okay.  I don't know --

20   Gary, were these businesses on the -- I'm looking on

21   the schedules, I don't know if these businesses were

22   listed?

23            MR. GREENE:  The Hartford, Straight

24   Turnpike and all those?

25            TRUSTEE MANGAN: Well, no within a year,
```

1    right?  You have to list them on the SOFA -- did you

2    put them on?

3              MR. GREENE:  I thought we did.

4              TRUSTEE MANGAN: Okay.  Let me double

5    check?

6              MR. GREENE:  Are you sure we didn't?

7              TRUSTEE MANGAN: I've got to look.

8              MR. GREENE:  Yeah, I'm pretty sure I

9    included them in the --

10             TRUSTEE MANGAN: I see the lawsuits and

11   then when it says -- see this is what I'm talking

12   about.

13             When I go to the section -- part 11,

14   question 27, within four years before you filed your

15   bankruptcy, did you own a business or have any of

16   the following connections to any business, the

17   answer is no.

18             MR. GREENE:  Oh, okay.

19             TRUSTEE MANGAN: So why is that?

20             MR. GREENE:  Because we used Best Case and

21   it didn't --

22             TRUSTEE MANGAN:  Well, Best Case only

23   prints out what you put in --

24             MR. GREENE:  Yeah.

25             TRUSTEE MANGAN: -- I use Best Case too.

```
 1            MR. GREENE:  No, there was a lot of nasty
 2    stuff between -- that went on for a very long time.
 3            TRUSTEE MANGAN: Well my point is, the
 4    schedules appear to be incomplete.
 5            MR. GREENE:  Yes.  I don't know why.  They
 6    definitely should be on there.
 7            TRUSTEE MANGAN: All right.  Well, maybe
 8    you should make some amendments to them?
 9            MR. GREENE:  Yes, yes, I will.
10    BY MS. MANGAN:
11        Q    Okay.  Now the -- so sir, those are your
12    only business interests that your claiming that you
13    had within the four years?
14        A    Yes.
15        Q    All right.  Now do you remember filling
16    out paperwork where you had to list your monthly
17    income, your monthly expenses, your present
18    occupation --
19        A    Yes.
20        Q    Okay.  And was all of that information
21    current and accurate when you provided it?
22        A    Yes.
23        Q    Has anything changed since you filed your
24    bankruptcy case?
25        A    No.
```

```
 1          Q     Now it looks like you're involved with a
 2   retail store right now?
 3          A     Yes.
 4          Q     Do you have any ownership interest in that
 5   franchise?
 6          A     No.
 7          Q     So you're just an employee?
 8          A     Correct.
 9          Q     Now do you pay child support or alimony to
10   anyone?
11          A     Child support.
12          Q     Okay.  And is your obligation current?
13          A     Yes.
14          Q     Let me see here, Gary.  Okay.  I do have
15   that.  I wasn't sure if I had it.  I do.  All right.
16   And your obligation is current is your testimony, is
17   that right?
18          A     Yes.
19          Q     And other than what we talked about, do
20   you claim any income from being self-employed?
21          A     No.
22          Q     All right.  Now for vehicles, I think you
23   listed a BMW.  Is that the only vehicle you have?
24          A     Yes.
25          Q     You don't own -- have you had any other
```

John Wayne Mocadlo - November 17, 2021          23

1   vehicles where your name is on the registration or

2   the title in the past year?

3        A    No, ma'am.

4        Q    Okay.  All right.  And I think on your

5   statement of intentions -- let me just double check

6   here. I think you filed one. I thought I saw it

7   before -- are you going to continue to make the

8   payments on the BMW, sir?

9        A    Yes, ma'am.

10       Q    And your apartment, you're going to

11  continue that lease?

12       A    Yes.

13       Q    All right.  And your attorney was required

14  to file a statement indicating how much you agreed

15  to pay him for legal services.  Do you remember

16  seeing that paperwork before it was filed with the

17  court?

18       A    Yes.

19       Q    And did the amount Attorney Greene

20  disclose on there match the amount you paid him?

21       A    Yes.

22       Q    Okay.  Are there any creditors on the line

23  or any other parties in interest on the line that

24  wish to ask Mr. Mocadlo any questions?

25            MR. ZEISLER:  Yes.

1          MS. MOORE:  Yes.

2          TRUSTEE MANGAN:  Okay.  I hear somebody --

3   who spoke first, please?

4          MR. ZEISLER:  This is Richard Zeisler, I'm

5   not sure --

6          TRUSTEE MANGAN: Oh, Attorney Zeisler,

7   okay.

8          MR. ZEISLER:  -- I just have a few

9   questions.

10          TRUSTEE MANGAN: Q   Okay.  Can you please

11   identify yourself and who you represent?

12          MR. ZEISLER:  Richard Zeisler, I represent

13   Charles Kuman and possibly several others, but I

14   have not been retained or I have not agreed to serve

15   on behalf of anyone else at this moment.

16          TRUSTEE MANGAN: Okay and do you have some

17   questions for Mr. Mocadlo?

18          MR. ZEISLER:  Yes, I do.

19          TRUSTEE MANGAN: Okay.  Please proceed.

20   EXAMINATION BY RICHARD ZEISLER:

21      Q    Number one, insofar as the automobile

22   dealerships are concerned, you've spoken of the

23   Hartford Auto Group, which was a Mitsubishi

24   dealership, another Mitsubishi dealership in

25   Watertown, I believe, and Saybrook Buick in Old

John Wayne Mocadlo - November 17, 2021                25

1    Saybrook.  Were those the only car dealerships in

2    which you had an interest or an option to have an

3    interest?

4         A    The only other one that you did not name

5    was BW Motors.

6         Q    Okay.  And what was BW Motors?

7         A    It was a Buick GMC store that was given to

8    me by General Motors.

9         Q    In where?

10        A    In Milford on Bridgeport Avenue, 750

11   Bridgeport Avenue.

12        Q    And did you pay money for that dealership

13   or invest money in the dealership?

14        A    Invested money in the dealership.

15        Q    Approximately how much?

16        A    Probably about $500,000.

17        Q    And did that dealership ever open?

18        A    No.  It was deemed that it could not open

19   by General Motors.

20        Q    And was it General Motors that awarded it

21   to you?

22        A    Yes.

23        Q    And then they deemed that it could not

24   open?

25        A    By Motor Vehicle, I apologize.  Motor

1    Vehicle deemed that it could not open.

2         Q    And what did you do about that?

3         A    We tried to appeal it and I just didn't

4    have any more capital to pursue that interest any

5    more and it hurt every business critically.

6         Q    So the appeal was never completed?

7         A    Yes, sir.

8         Q    Okay.  Insofar as the Mitsubishi

9    dealerships, did you have any partners?

10        A    Yes, I did.

11        Q    And they were?

12        A    Herlof Sorensen was the gentleman that

13   purchased Charles Kuman's interest.

14        Q    No, no. What I'm asking you is who were

15   your partners in the Mitsubishi dealership?

16        A    Herf Sorensen.

17        Q    And is that dealership still in operation?

18        A    No.

19        Q    And is there a Mitsubishi dealership

20   operating in the same location?

21        A    In Watertown, no.  In Hartford, yes.

22        Q    And who is the owner of that?

23        A    I can't be 100 percent -- honest, I do not

24   know exactly, but I believe it's him and one other

25   party.

1      Q     Okay.  Did you receive any proceeds from

2   the sale of that dealership?

3      A     No.

4      Q     Before the dealership closed and the COVID

5   took place, were funds received from the government

6   by way of assistance during the COVID?

7      A     The people who were managing the

8   dealership received funds on my behalf for the

9   business.

10      Q     And who were the people who were managing

11   the dealership?

12      A     Herlof Sorensen and Tony Arudia.

13      Q     And how much was received by way of COVID

14   for that dealership?

15      A     Which dealership?

16            MR. GREENE: When you say COVID, you mean

17   the PPP?

18      Q     PPP money, correct.

19      A     On which dealership?  Which dealership?

20            MR. GREENE:  Which dealership?

21      Q     Both either -- both.

22      A     Okay.  So the Hartford dealership, I

23   believe, received $170,000 and I believe -- I don't

24   know, honestly, what the Watertown dealership

25   received.

1      Q      And what happened with those proceeds?

2      A      Those proceeds, all of it went into the

3  operating accounts in the businesses and were used

4  for dealership expenses, which even Attorney Greene

5  is privy to and knows where all the money went.

6      Q      Well, I wonder if you could explain to the

7  trustee where all the money went, if you know.

8      A      Yeah, it was put into the operating

9  agreement.  There was -- all the money was put into

10  the operating account for both dealerships and it

11  was put in Nutmeg Federal Credit Union and it was

12  under control of Tony Arudia and Herlof Sorensen.

13      Q      And do you have claims against either of

14  those people?

15      A      No.

16      Q      Have you ever brought suit against either

17  of them?

18      A      No.

19      Q      Have either of them brought suit against

20  you?

21      A      No.

22      Q      And in the course of managing those two

23  dealerships, did those dealerships open offshore

24  companies for warranty sales, extended warranties on

25  vehicles?

John Wayne Mocadlo - November 17, 2021                    29

1        A    No.

2        Q    No?

3        A    No.

4        Q    Neither of those dealerships ever sold to

5   a customer who purchased a vehicle an extended

6   warranty?

7        A    Yes, they did -- we did sell extended

8   warranties.

9        Q    Okay.  And who owned the extended warranty

10  contracts?

11       A    Credit Guard out of Hamden, Connecticut.

12       Q    Who is that?

13       A    It's a company that underwrote the

14  extended warranty contracts.

15       Q    Okay.  But did you receive or will you

16  receive any benefit from those extended warranties

17  as they run out with respect to excess profits

18  earned by the extended warranty company?

19       A    No, sir.

20       Q    Isn't that a customary automobile way to

21  make money.  The dealer sells an extended warranty

22  and over the years reaps a profit when the warranty

23  has expired?

24       A    In some instances, yes, but in my instance

25  where I needed the capital to fund the Buick GMC

1    store, I took an advance with NMAC, which gives the

2    money up front instead of it coming to fruition

3    after two to three years.

4         Q    Do you have evidence of the fact that

5    there was no money coming in on the extended

6    warranties?

7         A    Well, NMAC has launched a suit against me

8    which is included in the bankruptcy that states that

9    they're looking for that advance money and that's

10   all the money -- they would forfeit anything coming

11   in, in the future.  But there is nothing.  The

12   advance was taken up front.

13        Q    Okay.  And what about the extended

14   warranties at the Saybrook Buick store?

15        A    That was also held by NMAC and that's also

16   --

17        Q    Well that was a -- that was a similar

18   situation?

19        A    Yes, sir.

20        Q    Okay.  Now we're into a new area.  Was

21   there tax losses which were sustained in these

22   automobile dealerships?

23        A    No.

24        Can you give a time frame?  Are you talking

25   about the last couple of years or --

1          Q     I'm talking about in the last four years.

2          A     No.

3          Q     So is there any way to recapture income

4     which you paid over the last -- to the Internal

5     Revenue Service while the dealerships were

6     profitable, is there a way to recover that by way of

7     the losses that were sustained at the end of the

8     life of the dealerships?

9          A     I do not know.

10               MS. MANGAN:  Attorney Zeisler, if I could

11     -- Attorney Zeisler, if you could just ask -- I'm

12     going to have to limit this because I have somebody

13     else that wants to examine the debtor.  If you could

14     just ask -- I don't know how many questions you have

15     --

16               MR. ZEISLER: I have no problem with that.

17     The only other area that I wanted to get into was

18     this sneaker store that he is employed at which is

19     allegedly owned by his brother and I simply wanted

20     to look into that, but I'm certainly happy to pass

21     to someone else.

22               MS. MANGAN:  Okay.  Thank you very much.

23     And is there anyone else on the line that would like

24     to ask some questions of the debtor?

25               MS. MOORE:  Yes.

1          MS. MANGAN:  Okay.  Can you please

2    identify yourself and the party of interest you are

3    with?

4          MS. MOORE:  Yes, thank you.  Bonnie, I'm

5    Jennifer Moore.  I'm a paralegal with the U.S.

6    Trustee's office.

7          MS. MANGAN:  Okay.  And you have some

8    questions for the debtor.

9          MS. MOORE:  I do.

10   EXAMINATION BY JENNIFER MOORE:

11        Q    Mr. Mocadlo, my name is Jennifer Moore and

12   I'm a paralegal with the U.S. Trustee's office.

13        A    Hello.

14        Q    And you provided our office -- hello --

15   you provided our office with some documents through

16   your attorney and I just have a few questions for

17   you.

18        A    Of course.

19        Q    Okay.  Thank you.

20             Looking at your schedules, you list a

21   receivable from a joint venture investment of

22   approximately $18,000.  Do you want to explain that?

23   Could you explain that, please?

24        A    Yes.  In January of 2020, I purchased half

25   of a body shop from Wakefield Corp., who is owned by

1    Kevin Sissy (ph) and it was for $80,000 and there

2    has been payments made to me for my interest in that

3    investment and the $18,000 is what's left that's

4    owed to me.

5         Q    Okay.  And that was -- I'm sorry, that was

6    Wakefield Corp?  Is that what you said, sir?

7         A    Yeah.

8         Q    When I was looking at some of the

9    documents that you provided. and you have gone over

10   some businesses, there's a few other businesses I

11   just want to ask you if you are affiliated with or

12   if you had ownership in.  Did you have any ownership

13   interest in Mac Auto Group?

14        A    Yeah, it's the same thing -- it was just a

15   name for the group of dealerships.  It was an actual

16   entity assigned to (indiscernible).

17        Q    So did Mac Auto Group, did that operate

18   under the Hartford Auto Group and BMW Motors?

19        A    Yeah.  It was pretty much -- we just

20   called it Mac Auto Group and it was the four

21   entities.

22        Q    And the four entities --

23        A    Yeah.

24        Q    -- the four entities that we've spoken

25   about?

1      A     Correct.

2      Q     Okay.  You've got an ownership interest in

3   Route 9 Automotive, LLC?

4      A     No.  Never been.

5      Q     How about Four Horseman Entertainment,

6   Incorporated?

7      A     Yeah, that was a business I owned actually

8   more than four years ago.  It was a nightclub.

9      Q     Okay.  Do you recall when you no longer

10   held an ownership in the Four Horsemen

11   Entertainment?

12      A     August, 2017, that's when it was -- it

13   strung on, but that was when I was done with that.

14      Q     Okay.  August of 2017.  Okay.  All right.

15   Do you have any ownership interest in Elm City Tap

16   House?

17      A     No.  That -- my partners had bought me out

18   or actually I just signed off my interest and they

19   took over that business.  So I have nothing to do

20   with that business at all.

21      Q     Okay.  You didn't have an interest in that

22   business?

23      A     No.  I'm not even allowed there.

24      Q     Okay.  I'm looking at your -- back to your

25   schedules, could you explain the debt that those two

1    premier financial services?

2        A    Yeah.  There was a McLaren 720S pro stock.

3        Q    And you have a large debt with Rolls Royce

4    Motors Cars too on your schedules.  Can you explain

5    that debt?

6        A    Yeah.  It was the difference of a Rolls

7    Royce Cullinan, it was a leased vehicle.

8        Q    That vehicle has been returned?

9        A    Yes, it was repossessed.

10       Q    Do you know when that happened?

11       A    March of this year.

12       Q    How long have you been employed with your

13   current employer that you have listed on your

14   schedules?

15       A    February 1st.

16       Q    Of this year?

17       A    Yes.

18       Q    You provided our office with some

19   financial statements and I didn't see any of the

20   deposits coming in from your current employer and I

21   didn't know if you had any other accounts?

22       A    No.  I cashed them at Bank of America on

23   1500 New Britain Avenue.

24       Q    So you cash your paychecks?

25       A    Yes, ma'am.

1      Q    Do you have an account with Bank of

2    America?

3      A    No, ma'am.

4      Q    Okay.  I just have one more question if

5    you can just -- it looks like there's a civil suit

6    that was brought by Nissan Motors Acceptance

7    Company?

8      A    Yes.

9      Q    Okay.  You're aware of that?

10     A    Yes.

11     Q    Okay.  Does that have to do with what you

12   were explaining earlier in your testimony about the

13   extended warranty business?

14     A    Yes.  There's two different options when

15   you do extended warranties.  You can either take the

16   money up front with a percentage of payback, or at

17   the end.  And since I needed the capital to get the

18   Buick GMC store initialized, I took it up front.  So

19   that's -- yes.

20     Q    How much did you take up front?

21     A    Collectively or just from that one

22   dealership?

23     Q    Well let's do the one dealership, the one

24   dealership?

25     A    Which dealership?

1       Q     Would that be a dealership for Straight?

2       A     Straight Turnpike, I believe it was

3  350,000.

4       Q     Okay.  How about Hartford Auto Group?

5       A     I believe that was 250,000.

6       Q     BW Motors?

7       A     I want to say 385,000.

8       Q     85, okay.  And how about Saybrook Buick

9  GMC?

10      A     That was -- I think it was 350,000 as

11  well.

12      Q     Okay.  You may have already -- this may

13  have already been asked and you may have already

14  answered my last question, but when were you bought

15  out again?

16      A     From the dealerships or from Barberino?

17      Q     From the dealership.

18      A     From the four --

19      Q     Dealerships.

20      A     -- yeah four -- the deal was signed on

21  January, 2020, where I turned over interest.  It

22  just takes a long time to close car dealerships, so

23  I signed over all interest then.

24      Q     Okay.  For those four dealerships that

25  we've been talking about?

1          A     Correct.

2          Q     Okay.  That's all the questions I have.  I

3     appreciate your time.

4          A     No problem.

5                MS. MANGAN:  All right.  Do we have any

6     other creditors on the line?

7                MS. MITCHELL:  Hi, Bonnie, yes.  I have a

8     couple of questions.

9                MS. MANGAN:  Okay.  Can you please

10    identify yourself and the party in interest that

11    you're with?

12    EXAMINATION BY KARI MITCHELL:

13         Q     Good afternoon, Mr. Mocadlo.  My name is

14    Kari Mitchell.  I am an attorney and I represent the

15    United States Trustee and I have a couple of

16    questions for -- that Ms. Moore just asked you.

17         A     Okay.

18         Q     I believe that you testified that you were

19    bought out of Elm City Tap House, is that correct?

20         A     Yes.  Everything was -- all my interest

21    was signed over, correct.

22         Q     Okay.  How much did you receive?

23         A     Zero.  I lost all my investment in them.

24         Q     Okay.  And all of these monies that you

25    received at the front end of the extended warranty

1    business, what -- did you receive all of those

2    monies for the dealerships at the same time or was

3    it over a period of time?

4         A    It was a period of over 16 months and it

5    all went to the respective operating accounts.

6         Q    And what time period would that have been?

7         A    I believe the first one was in December of

8    2018 all the way to December of 2019.

9         Q    And your testimony is that those monies

10   went into the corresponding operating accounts?

11        A    Yes, ma'am.

12        Q    Do you have access to those operating

13   accounts?

14        A    No.  I have not had access to those

15   accounts since January of 2020, when I signed over

16   the dealerships.

17        Q    Okay.  Which bank -- were they all held at

18   the same bank or different banks?

19        A    They all were at -- three of them were

20   through Nutmeg Federal Credit Union and one of the

21   accounts, was I believe, Saybrook -- I believe

22   Attorney Zeisler would remember the bank.

23   I believe it was Saybrook Bank or something like

24   that which was one of them.

25             So three of them were Nutmeg Federal

John Wayne Mocadlo - November 17, 2021                    40

1    Credit Union and the other one was Saybrook, I think

2    it was.

3        Q    Okay.  And the monies, were those issued

4    via check or a direct deposit into the accounts?

5        A    No.  All via check made out to the entity

6    itself.

7        Q    Okay.  And my -- out of curiosity why did

8    you choose to cash your paychecks rather than having

9    direct deposit with your current employer?

10       A    I have actually a garnishment on my

11   account.  I haven't been able to use my banking for

12   more than five months now.

13       Q    Okay.  Even since you filed your

14   bankruptcy?

15       A    I haven't even tried because all my

16   accounts were closed, so I just -- I have no money,

17   so I'm just cashing my check.  I just didn't want to

18   take the risk of opening another account and losing

19   the money.

20       Q    Okay.  Do you own any of the fancy

21   sneakers that you sell, at I believe the company --

22            MS. MANGAN:  Yeezy's -- we want to know

23   about the Yeezy's.

24       A    No, I three pairs of personal sneakers out

25   -- which I'll be more than happy to take pictures

1    and disclose them.

2         Q    Okay.  I'm sorry, can you repeat that?

3         A    I have three pairs of sneakers, more than

4    like $150 that I'll be more than happy to take a

5    picture of and submit.

6         Q    Okay.  When did you purchase those?

7         A    Over the last handful of months.

8              MS. MITCHELL:  Okay.  That is all I have

9    for right now.  I thank you for answering my

10   questions and I apologize for jumping in, Trustee

11   Mangan.

12             MS. MANGAN:  No, no, it's okay.

13             THE WITNESS: Okay.  You're welcome.

14             MS. MANGAN:  Anybody else, anybody else

15   out there?  Okay.  So --

16             MR. ZEISLER:  I wonder if I could get back

17   to the -- it's Richard Zeisler. if I could get back

18   into that one area that I didn't get into?

19             MS. MANGAN:  Sure.  I'll give you a few

20   more minutes, Attorney Zeisler, and then

21   unfortunately I do have to move on, but I'm happy

22   to, you know --

23             MR. ZEISLER:  Okay.  I'll try to make it

24   brief.

25             MS. MANGAN:  -- yeah, no, do your best.

1    EXAMINATION BY RICHARD ZEISLER:

2       Q    John, the question I was asking, is your

3    brother the owner of the sneaker shop?

4       A    Yes.

5       Q    And where are these sneaker shops located?

6       A    There is one in West Hartford,

7    Connecticut, there's one in Short Hills, New Jersey,

8    there's one in Orlando, Tampa, Florida, Palm Beach,

9    Florida, Los Angeles and Denver.

10      Q    And where was the source of funds for

11   opening these locations?

12      A    Well, he -- the very first location he

13   opened it was, I think, a collection -- it was a

14   very, very small store and the other location he

15   borrowed money, hard money. The company has a lot of

16   debt, and it's -- there's a UCC filing on all the

17   sneakers, on everything.  So it was all hard money.

18      Q    Where did the money come from?  Where was

19   the hard money from?

20      A    Wayne Basterash.

21      Q    And did you co-sign or in any way assist

22   in getting those funds?

23      A    No.

24      Q    Did you bring him to Mr. Basterash?

25      A    Yeah.

John Wayne Mocadlo - November 17, 2021                    43

```
 1         Q    I couldn't hear you.

 2         A    Yeah.

 3         Q    And do you have any interest in these

 4    stores?

 5         A    No, sir.

 6         Q    And did your brother invest any money in

 7    them to start with?

 8         A    He did have the sneakers, so he did, but I

 9    know the bank account -- he started with like about

10    $1,000.

11         Q    And did any of your money go into your

12    stores or into the development of the concept?

13         A    No, sir.  Just sweat equity.

14         Q    And are the stores profitable now?

15         A    I don't have access to that information.

16    I don't have access to --

17         Q    And what's your income from those stores

18    on a weekly basis?

19         A    $1,000 a week.

20         Q    And with that $1,000 a week are you paying

21    your child support, exotic BMW eight vehicle, for

22    your apartment in Hartford and for living expenses?

23         A    Yes.  In conjunction with the money that's

24    owed, the $2,200 I get a month from Wakefield Corp,

25    I just get by.
```

1        Q    Okay.  Thank you, John.

2        A    Thank you.

3            MS. MANGAN:  Okay.  I think I'm going to

4    continue this meeting. Gary, I have to look at some

5    of the information.  I saw that you sent me over the

6    real estate.  You've got to make some amendments to

7    the schedules, right?

8            MR. GREENE:  Yep, yes.

9            MS. MANGAN:  All right.  So I am -- let me

10    see, my next dates are, I'm thinking December 15th

11    for followup.  I'm not sure if you're going to have

12    to appear and testify, but right now I'm going to

13    mark it for documents only.  Okay?  And we'll make

14    that for like a 1:30 time --

15            MR. GREENE:  Okay.  You got those

16    documents and we'll amend with --

17            MS. MANGAN:  I got the -- yeah.  I got the

18    ones for the house and it sounds like there's a few

19    amendments you need to make --

20            MR. GREENE:  Yep.

21            TRUSTEE MANGAN:  And then I'll let you

22    know if we need to be on for testimony again or not.

23    BY TRUSTEE MANGAN:

24        Q    And the only other question I had, sir,

25    you list some watches on question 12 for jewelry,

1   can you please give me a little more detail of what

2   kind of watches those are?

3       A    Very basic Rolex stainless which is like a

4   $3,000 watch and you know, I'm kind of embarrassed,

5   but I have a couple of fake watches.  That's it.

6       Q    And the Rolex, is it an anniversary

7   edition, or what is it.

8       A    You know, basic, just stainless, they're a

9   very, very basic watch.

10          TRUSTEE MANGAN: Okay.

11      So again, we're going to continue it to

12  December 15th, 2021 at 1:30.  I'll let you know if

13  we need testimony, but right now it's really for

14  just documents and amendments.  Okay?  We'll

15  followup then.  Thank you.

16          MR. GREENE:  Okay.  Thank you.

17          MR. MOCADLO:  Thank you guys.

18          TRUSTEE. MANGAN:  All right.  Thank you.

19      (Meeting adjourned).

20

21

22

23

24

1          I, CHRISTINE FIORE, Certified Electronic Court

2     Reporter and Transcriber, certify that the foregoing

3     is a correct transcript from the official electronic

4     sound recording of the proceedings in the above-

5     entitled matter.

6

7          *Christine Fiore*

8     _____     July 8, 2022

9          Christine Fiore, CERT

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2    WITNESS:                                      Page

 3    JOHN WAYNE MOCADLO

 4    Examination by Trustee Mangan                 3,44

 5    Examination by Mr. Zeisler                   24,42

 6    Examination by Ms. Moore                       32

 7    Examination by Ms. Mitchell                    38

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```